Mark C. Scarsi (SBN 183926)
mscarsi@milbank.com
Miguel Ruiz (SBN 240387)
mruiz@milbank.com
Jennifer L. Miremadi (SBN 245559)
jmiremadi@milbank.com
Ashlee N. Lin (SBN 275267)
ashlee.lin@milbank.com
Michael Sheen (SBN 288284)
msheen@milbank.com
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California  90017
Telephone:  (213) 892-4000
Facsimile:   (213) 629-5063

Christopher J. Gaspar (*pro hac vice*)
cgaspar@milbank.com
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005

*Attorneys for Defendant Apple Inc.*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WI-LAN USA, INC. and WI-LAN, INC., <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., <br><br> Defendant. | Case No.: 3:13-cv-798-DMS (BLM) <br><br> **DEFENDANT APPLE INC.'S OPPOSITION TO WI-LAN'S MOTION FOR RECONSIDERATION OF THE COURT'S ORDER GRANTING APPLE'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT** <br><br> Hearing Date: December 12, 2014 <br> Time: 1:30 p.m. <br> Department: 13A <br> Judge: Hon. Dana M. Sabraw <br> Magistrate Judge: Hon. Barbara L. Major <br><br> Complaint Filed: December 6, 2012 |

**OUTSIDE ATTORNEYS' EYES ONLY – RESTRICTED INFORMATION – UNDER PROTECTIVE ORDER**

This filing contains confidential information filed in this case by Defendant Apple Inc., and its contents shall not be displayed or revealed except by order of the Court presiding over this matter.

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ............................................................................................. 1

II.   RELEVANT FACTUAL BACKGROUND ....................................................... 2

    A.    Background of the Present Motion ....................................................... 2

    B.    Wi-LAN's New Theory Conflicts with Its Infringement
         Contentions ........................................................................................... 2

    C.    Wi-LAN's New Theory Conflicts with Its Claim Construction
         Briefing ................................................................................................. 3

    D.    Wi-LAN's New Theory Conflicts with Its Experts' Reports and
         Deposition Testimony .......................................................................... 4

    E.    Wi-LAN's New Theory Conflicts with its Opposition to
         Apple's Motion for Summary Judgment ............................................. 5

III.  RECONSIDERATION IS AN EXTRAORDINARY REMEDY ................. 5

IV.  RECONSIDERATION OF THE COURT'S CLAIM
     CONSTRUCTION IS PROCEDURALLY IMPROPER ............................. 7

    A.    Wi-LAN Presents No Basis for Reconsideration ................................ 7

    B.    Wi-LAN's Motion for Reconsideration Asserts an Entirely New
         Infringement Theory after the Close of Discovery ............................. 8

V.   SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE
     '040 PATENT WAS WARRANTED ......................................................... 9

    A.    The Court's Construction of "Specified Connection" Is Correct ....... 10

    B.    The Evidence Wi-LAN Cites in Its Motion Is Consistent with
         the Court's Claim Construction ........................................................... 12

         1.    The '040 Patent Specification Does Not Support Wi-
              LAN's Construction ................................................................. 12

         2.    Neither the Prosecution History of a Related Patent nor
              the Provisional Application Supports Wi-LAN's
              Proposed Construction ............................................................ 13

    C.    There Is Only One "Specified Connection" Between the
         Baseband Processor and the Base Station ........................................... 15

-i-

1.  The Asserted Claims of the '040 Patent Require a Plurality of "Specified Connections" .......................................15

2.  Only One "Specified Connection" Exists Under Wi-LAN's New Theory .....................................................16

VI.  SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE '640 PATENT WAS WARRANTED...........................................17

A.  The Court's Construction of "UL Connections" Is Correct ..............18

B.  Wi-LAN's Cited Evidence Supports the Court's Claim Construction ......................................................................19

1.  The '640 Patent Allocates Bandwidth Based on QoS Priority Across User Connections, Not Control Messages ......20

2.  Wi-LAN Misidentifies "Connections" in the '640 Patent........21

3.  The Prosecution History for the '640 Patent Does Not Support Wi-LAN's Proposed Construction ...........................22

C.  There Is Only One "UL Connection" Between the Baseband Processor and the Base Station ...........................................24

VII.  CONCLUSION ...........................................................................25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abdulkhalik v. City of San Diego*,
No. 08-CV-1515 MMA (NLS), 2009 WL 3514547 (S.D. Cal. Oct. 26, 2009) ...................................................................................... 7

*Ameranth, Inc. v. Pizza Hut, Inc.*,
No. 12-cv-1627 JLS NLS, 2013 WL 3894880 (S.D. Cal. July 26, 2013) ...................................................................................... 9

*Audionics Sys., Inc. v. AAMP of Florida, Inc.*,
No. CV 12-10763 MMM JEMX, 2014 WL 3563311 (C.D. Cal. Mar. 12, 2014) ............................................................................ 9

*Campion v. Old Republic Home Prot. Co., Inc.*,
No. 09-CV-748-JMA (NLS), 2011 WL 1935967 (S.D. Cal. May 20, 2011) ...................................................................................... 6

*E-Pass Techs. Inc. v. 3Com Corp.*,
222 F. Supp. 2d 1157 (N.D. Cal. 2002),
*vacated on other grounds*, 343 F.3d 1364 (Fed. Cir. 2003) ................ 9

*Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*,
93 F.3d 1572 (Fed. Cir. 1996) .......................................................... 13

*F.T.C. v. Neovi, Inc.*,
No. 06-CV-1952-JLS (JMA), 2009 WL 56130 (S.D. Cal. Jan. 7, 2009) ...................................................................................... 6

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004) ........................................................ 13

*Kona Enters., Inc. v. Estate of Bishop*,
229 F.3d 877 (9th Cir. 2000) .......................................................... 6, 7

*Lucent Techs., Inc. v. Gateway, Inc.*,
Nos. 02-cv-2060-B(CAB), 03-cv-0699-B (CAB), 03-cv-1108-B (CAB), 2007 WL 1877982 (S.D. Cal. June 27, 2007) ........................ 9

*School Dist. No. 1J, Multnomah Cnty., Or. v. ACandS Inc.*,
5 F.3d 1255 (9th Cir. 1993) .............................................................. 5

-iii-

*Single Chip Sys. Corp. v. Intermec IP Corp.*,
    No. 04-CV-1517 JAH (BLM), 2006 WL 6143241 (S.D. Cal. Aug.
    7, 2006) ........................................................................................................ 6, 7

*Strobel v. Morgan Stanley Dean Witter*,
    No. 04-CV-1069 BEN (BLM), 2007 WL 1053454 (S.D. Cal. Apr.
    10, 2007) ......................................................................................................... 6

*U.S. ex rel. Technica, LLC v. Carolina Cas. Ins. Co.*,
    No. 08-cv-1673-JAH (CAB), 2011 WL 1121276 (S.D. Cal. Mar.
    21, 2011) .................................................................................................... 6, 7

**OTHER AUTHORITIES**

Fed. R. Civ. P. 1 .............................................................................................. 8

Fed. R. Civ. P. 59(e) ........................................................................................ 5

# I.    INTRODUCTION

Wi-LAN seeks to completely change its theory of the case. After two years of litigation, including two thousand pages of expert reports, seventy hours of engineer and expert depositions, and two rounds of *Markman* hearings, Wi-LAN now argues that the "connections" recited in the asserted claims refer to connections between the intermediary (i.e., the "node" or "wireless subscriber radio unit"[1]) and the ***base station***, rather than between the intermediary and the ***users or services***, as Wi-LAN has contended for the past two years. But Wi-LAN offers no new, previously unavailable evidence or intervening change in the controlling law to justify its about-face. Rather, Wi-LAN suggests that the Court erred in construing "connection" by failing to adopt a position no party even remotely suggested. While Wi-LAN attempts to support its new position with citations to extrinsic evidence, Wi-LAN fails to address the fact that the Court's current construction is much more consistent with the intrinsic record. Reconsideration of the "connection" terms is therefore inappropriate.

While Wi-LAN's motion is certainly ill-based, it is futile as well. Even if the Court were to reconsider and reconstrue the "connection" terms, as Wi-LAN requests, Wi-LAN faces the same non-infringement problem it did with respect to its first infringement theory. Wi-LAN would again be unable to show that the accused products have a plurality of "connections" or that they allocate uplink bandwidth based on the priority of these "connections." As was evident from the parties' presentations at the last hearing, there is only one connection that carries data from the baseband processor to the base station. For all of these reasons, Apple respectfully asks the Court to deny Wi-LAN's Motion for Reconsideration.

---

[1] Because the parties and the Court agreed to construe the terms "wireless subscriber radio unit" and "wireless communication radio unit" to have the same meaning, any reference herein to one term shall also apply to the other term.

-1-

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Background of the Present Motion

On August 25, 2014, Apple moved for summary judgment of non-infringement[2] of all asserted claims of U.S. Patent Nos. 8,311,040 (the "'040 Patent") and 8,315,640 (the "'640 Patent") (collectively, the "Patents-in-Suit"). (ECF No. 175.)  On September 30, 2014, the Court granted Apple's motion (the "Summary Judgment Order").  (ECF No. 278.)  With respect to the '040 Patent, the Court found that the claims require more than one "specified connection" between the node and the users, and that, according to Wi-LAN's own expert's report, there is only one "specified connection" in Apple's products.  (*Id.* at 6–7.) With respect to the '640 Patent, the Court similarly found that the claims require multiple "UL connections" between the wireless subscriber radio unit and the users, and that Apple's accused products do not contain multiple "UL connections."  (*Id.* at 8–9.)   Based on these undisputed facts, the Court granted summary judgment of non-infringement on all asserted claims.  (*Id.*)

On October 28, 2014, Wi-LAN filed the present Motion for Reconsideration of the Court's Summary Judgment Order (the "Motion" or "Mot.").  (ECF No. 286-1.)  In its Motion, Wi-LAN  now argues that "specified connection" and "UL connections" refer to the connection between the node and the base station, and that Apple's products contain multiple connections of this type.  (Mot. at 3–18.)

### B.    Wi-LAN's New Theory Conflicts with Its Infringement Contentions

Wi-LAN served its initial infringement contentions on May 24, 2013, seven months before the Court issued its first *Markman* order.  (Declaration of Mark C. Scarsi in Support of Apple's Opposition to Wi-LAN's Motion for Reconsideration ("Scarsi Decl.") ¶ 2, Ex. A.)  In those contentions, Wi-LAN consistently took the

---

[2] Apple also sought partial summary judgment of invalidity on certain asserted claims, but the Court has not yet ruled with respect to these arguments.  (*See* ECF No. 278 at 1 n.1.)

-2-

position that the terms "specified connection" and "UL connections" referred to the link between the application processor and the baseband processor, not the link between the baseband processor and the base station. (*See id.*) Wi-LAN subsequently served five sets of amended infringement contentions before the close of discovery, and again, never took the position it does now. (*See* Scarsi Decl. ¶¶ 3–7, Exs. B–F.)

## C. Wi-LAN's New Theory Conflicts with Its Claim Construction Briefing

Wi-LAN submitted its opening claim construction brief in this case on September 30, 2013 and responsive claim construction brief on November 13, 2013. (ECF Nos. 84, 85.) Wi-LAN argued throughout its briefs that the term "specified connection" should be construed as "specified *service*" and that the term "UL connections" should be construed as "uplink *services*" that are allocated bandwidth by the intermediary. (ECF No. 84 at 9, 21–22.) Thus, Wi-LAN recognized that the claimed "connections" were associated with, if not equivalent to, users and services. Nowhere did Wi-LAN indicate that these "connections" should be construed as links to the base station.

The Court held a claim construction hearing on December 12, 2013. With respect to the term "specified connection," counsel for Wi-LAN argued that the '040 Patent specification "talks about information being distributed to *end users or services served by the connections* of that node." (Scarsi Decl. ¶ 8, Ex. G at 78:9–12 (emphasis added).) In support of its proposed construction of "UL connections," counsel for Wi-LAN further made clear it interpreted the "UL connections" as the connections between the subscriber unit and the users:

> The claim in the '640 Patent, again it talks about these UL connections. And it is not meant to describe the end user, it is meant to describe *how you are getting to the end user*. . . . So you can think about the customer premises equipment[3] looking at all of its

---

[3] The specification refers to the subscriber unit as "customer premises unit."

connections *that have a user or a service on the other side* and figuring out how to allocate bandwidth to each of those connections.

(*Id.* at 80:4–19 (emphasis added).)

On December 23, 2013, the Court issued its Order Construing Patent Claims (the "*Markman* Order"), construing the term "specified connection" as "the communications link between a node and a specific end user" and the term "UL connections" as "an uplink connection between the wireless subscriber radio unit and its users." (ECF No. 98.)

After changing counsel (*see* ECF Nos. 99–106), Wi-LAN filed a motion for reconsideration of the *Markman* Order. (ECF No. 108.) In its motion, Wi-LAN requested clarification of the Court's construction of the terms "node" and "wireless subscriber radio unit" and reconsideration of the term "packing sub-header." (*Id.*) Wi-LAN did not seek reconsideration of, or even mention, the terms "specified connection" or "UL connection." (*See id.*)

### D. Wi-LAN's New Theory Conflicts with Its Experts' Reports and Deposition Testimony

On June 6, 2014, Wi-LAN served the Infringement Expert Report of Dr. Vijay Madisetti. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Nowhere in his report does Dr. Madisetti describe a "specified connection" or "UL connections" from the baseband processor to the base station.

-4-

On July 7, 2014, Wi-LAN served the Rebuttal Validity Expert Report of Dr. Vijay Madisetti and the Validity Report of Ken Stanwood. Nowhere in these expert reports does Dr. Madisetti or Mr. Stanwood describe a "specified connection" or "UL connections" from the baseband processor to the base station.[4]

At their depositions, Dr. Madisetti and Mr. Stanwood confirmed their understandings of the terms "specified connection" and "UL connections" as the connection between the intermediary and end users or services. (*See* Scarsi Decl. ¶ 12, Ex. K at 150:9–151:14, 153:5–22, 156:20–158:19; ¶ 13, Ex. L at 324:15–325:2, 379:23–381:12, 384:2–25.) Neither expert suggested that the "connection" terms should refer to a link between the intermediary and the base station.

### E.   Wi-LAN's New Theory Conflicts with its Opposition to Apple's Motion for Summary Judgment

On September 12, 2014, Wi-LAN submitted its opposition to Apple's motion for summary judgment. (ECF No. 199.) Nowhere in its opposition did Wi-LAN argue that the "connection" terms refer to a link between the intermediary and the base station. Nor did counsel for Wi-LAN raise such an interpretation at the hearing. (*See* Scarsi Decl. ¶ 14, Ex. M.)

## III.   RECONSIDERATION IS AN EXTRAORDINARY REMEDY

Reconsideration of a judgment pursuant to Fed. R. Civ. P. 59(e) is appropriate only when the moving party presents: (1) newly discovered evidence not previously available, (2) an intervening change in controlling law, or (3) evidence that the prior decision was based on clear error or was manifestly unjust. *School Dist. No. 1J, Multnomah Cnty., Or. v. ACandS Inc.*, 5 F.3d 1255, 1263 (9th

---

[4] In their reports, Dr. Madisetti and Mr. Stanwood presume that allocation of bandwidth must be among connections between the intermediary and the users or services. (*See* Scarsi Decl. ███████████████████████████████████████ 95–97, 2203–06, 2212–15, 2219–21, 2224, 2226–28, 2231–33.).)

Cir. 1993); *Single Chip Sys. Corp. v. Intermec IP Corp.*, No. 04-CV-1517 JAH (BLM), 2006 WL 6143241, at *3 (S.D. Cal. Aug. 7, 2006).  A finding of "clear error" requires that a decision be "more than just maybe or probably wrong; it must be dead wrong."  *Campion v. Old Republic Home Prot. Co.*, No. 09-CV-748-JMA (NLS), 2011 WL 1935967, at *1 (S.D. Cal. May 20, 2011) (quoting *Hopwood v. Texas*, 236 F.3d 256, 273 (5th Cir. 2000)).  "Manifest injustice" requires a showing that "extraordinary circumstances" justify relief.  *Strobel v. Morgan Stanley Dean Witter*, No. 04-CV-1069 BEN (BLM), 2007 WL 1053454, at *3 (S.D. Cal. Apr. 10, 2007).

Reconsideration of a prior order is an extraordinary remedy "to be used sparingly in the interests of finality and conservation of judicial resources." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (citations omitted); *see also Single Chip*, 2006 WL 6143241, at *3 ("The orderly administration of lengthy and complex litigation . . . requires finality of orders be reasonably certain.") (quoting *Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n.5 (9th Cir. 1989)).  Accordingly, a motion for reconsideration should "*not* be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enters.*, 229 F.3d at 890 (emphasis in original) (citations omitted).  A motion for reconsideration "is not an opportunity to renew arguments considered and rejected by the court, nor is it an opportunity for a party to re-argue a motion because it is dissatisfied with the original outcome." *F.T.C. v. Neovi, Inc.*, No. 06-CV-1952-JLS (JMA), 2009 WL 56130, at *2 (S.D. Cal. Jan. 7, 2009) (quoting *Devinsky v. Kingsford*, 2008 WL 2704338, at *2 (S.D.N.Y. 2008)).  Moreover, "[m]aterials available at the time of filing of an opposition are not 'newly discovered evidence' warranting a reconsideration of summary judgment." *U.S. ex rel. Technica, LLC v. Carolina Cas. Ins. Co.*, No. 08-cv-1673-JAH (CAB), 2011 WL 1121276, at *2 (S.D. Cal. Mar. 21, 2011) (citing *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.*,

-6-

813 F.2d 1553, 1557 (9th Cir. 1987); *Frederick S. Wyle Prof'l Corp. v. Texaco, Inc.*, 764 F.2d 604, 609 (9th Cir. 1985)).  Neither the Local Rules nor the Federal Rules governing motions for reconsideration are "intended to provide litigants with a second bite at the apple."  *Abdulkhalik v. City of San Diego*, No. 08-CV-1515 MMA (NLS), 2009 WL 3514547, *5 (S.D. Cal. Oct. 26, 2009) (quoting *Verble v. 9th U.S. Dist. Court*, 2007 U.S. Dist. LEXIS 33026, at *3 (S.D. Cal. 2007)).

## IV.    RECONSIDERATION OF THE COURT'S CLAIM CONSTRUCTION IS PROCEDURALLY IMPROPER

### A.    Wi-LAN Presents No Basis for Reconsideration

Disguised as a request for reconsideration of the Summary Judgment Order, Wi-LAN's Motion instead asks the Court to reopen claim construction for terms the Court addressed and construed in the early stages of this litigation.  Wi-LAN seeks reconsideration to adopt a completely ***different position*** than any it has ever taken throughout two years of litigation.  Wi-LAN however, has failed to make the showing required to justify such extreme relief.

To achieve "the interests of finality and conservation of judicial resources," courts require parties to meet a high burden to justify reconsideration of an order. *See Kona Enters.*, 229 F.3d at 890; *Single Chip*, 2006 WL 6143241, at *3.  Far from meeting this high burden, Wi-LAN fails to articulate any basis to warrant this Court's reconsideration.  First, Wi-LAN fails to identify any intervening change in controlling law—of either this Court or the Federal Circuit.  Second, throughout the case, Wi-LAN has been aware of every piece of evidence it now offers, and has had opportunities to raise these arguments at any point during the litigation— including during claim construction and in its first motion for reconsideration.  Wi-LAN's failure to timely raise these issues precludes it from doing so now.  *See Kona Enters.*, 229 F.3d at 890; *U.S. ex rel. Technica*, 2011 WL 1121276, at *2. Lastly, Wi-LAN fails to set forth any evidence that this Court's claim construction is the result of clear error or manifest injustice.

Wi-LAN's insinuation that it is entitled to reargue claim construction because it "was represented by different counsel at the time" of the initial claim construction process (*see* Mot. at 3 n.4, 14 n.11.) finds no basis in the law and is at best a disingenuous recitation of the facts. Wi-LAN's current counsel has been involved in these proceedings since January 2014 and represented Wi-LAN in its first motion for reconsideration. If Wi-LAN's current counsel truly believed that Wi-LAN's original counsel made a mistake in proposing constructions for the "connection" terms, Wi-LAN's current counsel could have brought that to the Court's attention in its first motion for reconsideration, or any time since then.

**B.      Wi-LAN's Motion for Reconsideration Asserts an Entirely New Infringement Theory after the Close of Discovery**

The Federal Rules of Civil Procedure and the Local Rules of this Court, including the Patent Local Rules, were designed "to secure the just, speedy, and inexpensive determination of every action and proceeding." *See* Fed. R. Civ. P. 1. Accordingly, in May 2013, this Court set forth a case schedule providing for clear and timely disclosure of Wi-LAN's infringement contentions well before trial. (*See, e.g.*, ECF Nos. 64, 73.) Wi-LAN served six sets of infringement contentions over the course of discovery. Based on these contentions, the parties participated in claim construction, conducted fact and expert discovery, and prepared evidentiary motions in anticipation of trial. Wi-LAN's Motion effectively seeks to unravel the progress in this case and amounts to an unjustified amendment of its infringement contentions in response to the Court's Summary Judgment Order.

Courts have held that infringement contentions serve a specific purpose:

> Infringement contentions . . . ***act as forms of pleading that disclose the parties' theories of their case and thereby shape discovery and the issues to be determined at trial. . . . [P]arties should proffer all of the theories of infringement that they in good faith believe they can assert***. As with other forms of pleadings, the infringement contentions should become more specific and fine-tuned as the case progresses, not more sprawling and encompassing. ***Nothing in this***

> *process, however, suggests that infringement contentions are*
> *intended to be a running dialogue between the parties, with*
> *additions of theories as one side asserts that a particular argument*
> *is unsustainable.*

*Ameranth, Inc. v. Pizza Hut, Inc.*, No. 12-cv-1627 JLS (NLS), 2013 WL 3894880, at *2 (S.D. Cal. July 26, 2013) (emphasis added) (quoting *Apple Inc. v. Samsung Elecs. Co.*, No. 12-cv-0630-LHK (PSG), 2013 WL 3246094, *3 (N.D. Cal. June 26, 2013)). Permitting Wi-LAN to assert a new theory of infringement—after discovery has closed and in opposition to an order granting summary judgment—would defeat the purpose of requiring infringement contentions in the first place. *See, e.g., Lucent Techs., Inc. v. Gateway, Inc.*, Nos. 02-cv-2060-B(CAB), 03-cv-0699-B (CAB), 03-cv-1108-B (CAB), 2007 WL 1877982, at *4 (S.D. Cal. June 27, 2007) (granting summary judgment because plaintiff could not succeed on infringement theory that the plaintiff did not set forth in its infringement contentions); *Audionics Sys., Inc. v. AAMP of Florida, Inc.*, No. CV 12-10763 MMM (JEMx), 2014 WL 3563311, at *6 (C.D. Cal. Mar. 12, 2014) (denying leave to file amended infringement contentions because the party asserting infringement failed to diligently and timely confirm whether its infringement contentions were complete and covered all theories it might need to assert in the action); *E-Pass Techs. Inc. v. 3Com Corp.*, 222 F. Supp. 2d 1157, 1161 (N.D. Cal. 2002) (refusing to allow plaintiffs to add infringement contentions in opposition to a motion for summary judgment), *vacated on other grounds*, 343 F.3d 1364 (Fed. Cir. 2003). For these reasons, the Court should deny Wi-LAN's Motion.

## V. SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE '040 PATENT WAS WARRANTED

Notwithstanding its procedural deficiencies, Wi-LAN's Motion also falls short substantively. Having failed to show multiple "specified connections" between the application processor and the Qualcomm baseband processor in the accused products, Wi-LAN now proposes that the term "specified connection"

-9-

refers to a connection between the node and the base station. For the reasons stated below, the intrinsic record—including the claims, specification, and prosecution history of the '040 Patent—supports the Court's construction, not Wi-LAN's new theory. But even if the Court were to adopt Wi-LAN's improper construction, Wi-LAN would still be unable to show that more than one connection exists between the baseband processor and the base station.

### A. The Court's Construction of "Specified Connection" Is Correct

The Court properly construed the term "specified connection." The '040 Patent is directed to the processing and reformatting of packets of information for transmission in a data communications system. (Scarsi Decl. ¶ 15, Ex. N at cols. 1:16–18, 19:29–22:48.) As the Court recognized, and as Wi-LAN now acknowledges, the '040 Patent discloses a base station and several nodes for transmitting data packets from a data source to users and vice versa. (*Id.* at col. 4:8–22.) Each node serves "multiple connections for users." (*Id.* at col. 4:40–41; ECF No. 98 at 3.) Like the "services" of the '640 Patent (*see* Section VI.A, below), the "users" in the '040 Patent may be service networks such as a local area network or individual users such as a workstation. (Scarsi Decl. ¶ 15, Ex. N at col. 4:40–44; ECF No. 98 at 3.) In the downlink direction, information is received by the base station, prepared for and transmitted across a data link to a node, and directed to the users or services. Information may be similarly passed in the uplink direction. (Scarsi Decl. ¶ 15, Ex. N at col. 4:47–53; ECF No. 98 at 3–4.) As described by the '040 Patent, incoming data arrives from the users or services as SDUs, or *service* data units, in multiple formats. These SDUs are converted to PDUs, or protocol data units, which have a format common to the broader communications system. (Scarsi Decl. ¶ 15, Ex. N at col. 3:48–52.)

To efficiently transmit data, the communications processor in each node allocates bandwidth across a plurality of user connections to accommodate the specific needs of each ***user or service***:

-10-

> The communications processor must allocate sufficient bandwidth to accommodate the bandwidth requirements imposed by ***high priority constant bit rate (CBR) services*** such as Tl, El and similar constant bit rate services and their respective formats. In addition, the communications processor must allocate the remaining system bandwidth to ***mid-priority services*** and also to the ***lower priority services*** such as Internet Protocol (IP) data services and their respective formats.

(*Id.* at col. 13:36–44 (emphasis added)[5]; *see also id.* at cols. 19:37–38, 20:55–58, 21:18–26.) Because the node of the '040 Patent seeks to accommodate bandwidth requirements imposed by users and services, the prioritization of "connections" as required by the claims must necessarily refer to connections ***to the users and services***, rather than to the base station.

The Court's construction of the term "specified connection" to mean "the communications link between a node and a specific end user" (*see* ECF No. 98 at 4–5) is therefore proper and consistent with the claims and specification of the '040 Patent.[6] In particular, the asserted claims of the '040 Patent require packing and fragmenting of SDUs to PDUs, the SDUs being "associated with a specified connection." (*See* Scarsi Decl. ¶ 15, Ex. N at cols. 19:29–36, 20:49–54, 21:14–17, 21:27–29.) Because SDUs carry incoming user data, SDUs must be associated with the connection to the user or service from which such data is generated, rather than the link from the node to the base station. (*See, e.g., id.* at 11:14–16 ("The information intended for each node 16 contains information to be distributed to the end users or services served by the connections of that node").)

---

[5] Absent from this discussion of priority is a reference to control information not generated by the users. Thus, the '040 Patent prioritizes between data from users or services, rather than control information, as Wi-LAN suggests.
[6] Notably, Wi-LAN declines to seek reconsideration for the intermediary terms ("node" and "wireless subscriber radio unit"), which recognize the relationship between users or services, the intermediary, and the base station. Wi-LAN's proposed constructions for the "connection" terms, however, ignores one ▮▮▮e of

**B.** **The Evidence Wi-LAN Cites in Its Motion Is Consistent with the Court's Claim Construction**

In support of its new construction of "specified connection," Wi-LAN relies on the '040 Patent specification, the provisional application, and a related patent. (*See* Mot. at 13–14.) None of the evidence Wi-LAN cites supports its position.

**1.** **The '040 Patent Specification Does Not Support Wi-LAN's Construction**

As Wi-LAN acknowledges in its Motion, the '040 Patent necessarily requires two types of links to the intermediary node: (1) the plurality of connections to the end users and services, and (2) the link to the base station. (*See* Mot. at 14.) However, Wi-LAN points to a single description of the term "connections" in the '040 Patent specification, and without explanation, draws the conclusion that the term "specified connection" in the asserted claims must refer to the link between the node and the base station.

Specifically, Wi-LAN notes that each node has a communications link that conveys uplink transmissions from the node to the base station. (*See* Mot. at 14.) Wi-LAN then ***self-annotates*** figure 1 of the '040 Patent and asserts that "Figure 1 shows a 'specified connection' between the node and base station" without presenting a basis for this conclusion. (*See* Mot. at 15.) In fact, the only "connections" illustrated in the '040 Patent are the "user connections" of figure 3, which, as described below, are what "specified connection" ultimately refers to. (*See* Scarsi Decl. ¶ 15, Ex. N at fig.3.) Wi-LAN's interpretation of the invention is inconsistent with the clear language of the asserted claims, which require the allocation of bandwidth among end users and services based on the ***priority of the "specified connection."*** (*See id.* at cols. 19:37–38, 20:55–58, 21:18–26.) Wi-LAN's construction would thus require a showing that bandwidth allocation is based on priorities of the links between the base station and *other* nodes. Wi-LAN does not and cannot show this, as it is unclear that such a prioritization exists, or

-12-

that each node would be aware of the priorities assigned to links between the base station and other nodes. In sum, Wi-LAN fails to point to any evidence that, when read plainly, is inconsistent with the Court's *Markman* Order.[7]

### 2. Neither the Prosecution History of a Related Patent nor the Provisional Application Supports Wi-LAN's Proposed Construction

Wi-LAN also offers the extrinsic prosecution history of U.S. Patent No. 8,009,667 (the "'667 Prosecution History") and the provisional application for the '040 Patent (the "'040 Provisional Application") to argue that the term "specified connection" refers to a link between the node and the base station. Neither of these references supports Wi-LAN's new theory.

First, the '667 Prosecution History clearly demonstrates that the term "specified connection" refers to the "user connections" described in the specification and illustrated in figure 3 of the '040 Patent. As Wi-LAN admits, it amended the claim term "user connection" to read "specified connection." (*See* Scarsi Decl. ¶ 17, Ex. P at 2335–46.) Contrary to Wi-LAN's suggestion now, it made these amendments not because it wished to differentiate the "user connection" from the link to the base station, but rather to indicate that different "user connections" could have variable-sized SDUs, in order to overcome a prior

---

[7] Wi-LAN points to U.S. Patent No. 8,213,359 (the "'359 Patent") to argue that the patentee used the term "specified connection" to refer to the connection between the node and the base station. Notwithstanding the fact that the '359 Patent is neither related to nor referenced by the '040 Patent, the claim language cited in the '359 Patent actually appears to *disprove* Wi-LAN's argument. In particular, claim 1 of the '359 Patent (to which claims 3 and 4 depend) separately describes both a "subscriber station that has a **wireless communication link to a base station**," and a "**specified connection**." (Scarsi Decl. ¶ 16, Ex. O at col. 17:38–52.) Given that the use of different terms in a single claim is presumed to reflect a distinction between the meanings of those terms, it is doubtful at best that the term "specified connection" in the '359 Patent refers to the connection between a CPE and a base station. *See, e.g., Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119–20 (Fed. Cir. 2004) ("[W]hen an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms.") (citing *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004); *Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996).

-13-

art challenge.[8]  (*See id.* at 2347–60.)

When read in context, Wi-LAN's submissions make clear that each "connection" is associated with a user or service.  In the paragraph preceding Wi-LAN's excerpt of its July 26, 2010 Response to Office Action, Wi-LAN explains that for transmission in the uplink direction, the "***subscriber station . . . organizes data per connections***: see Figure 7.  'The information intended for each node 16 contains information to be distributed to the ***end users or services served by the connections of that node***; this is identified in Fig. 7 as connection data 720.  The connection data 720 includes the information to be transmitted to the users or services as well as control information the node uses to identify to which of its connections each packet of information should be directed.'"  (*See* Mot. at 16; Scarsi Decl. ¶ 18, Ex. Q at 2371– 72.)  Thus, each "connection" must link a user or service with the node.

Similarly, the '040 Provisional Application provides a description of the connections between the node and the users or services consistent with the Court's construction for the term "specified connection."  As the '040 Provisional Application states, the invention indisputably contemplates that "a linking, or transporting, communication system accept data in many formats, and ***convert the data into a transporting format for the transport across the link***."  (Scarsi Decl. ¶ 19, Ex. R at 2386 (emphasis added).)  In describing the invention's packing and fragmentation method, the '040 Provisional Application states the following:

> . . . ***if the connection carries variable length SDUs***, the length of each individual SDU and any fragments of SDUs is explicitly carried in the packing subheader for the SDU (or fragment).  ***If the connection carries fixed length SDUs***, the presence of a fragment and the length of that fragment is implied by a non-zero remainder when dividing the

---

[8] Even after amending the claim language, Wi-LAN tellingly continued to use the term "user connection" in distinguishing its patent application from the prior art. (*Compare id.* at 2335–36 (amending claim 51 with the term "specified connection") *with id.* at 2352–55 (discussing the prior art's failure to disclose bandwidth allocation to *user* connections).)

length specified in the MAC header by the length of the fixed size SDU.

(*Id.* at 2390 (emphasis added).) Thus, the connection between a user or service and the node carries the SDUs. Wi-LAN's alternative would result in links between the node and the base station carrying SDUs, a scenario that would defeat the very purpose of the '040 Patent.

In support of the provisional application, the inventors attached a 352-page IEEE 802.16.1 draft standard document as an exemplary embodiment of the claimed invention. However, this draft standard did not describe connections between the node and users or services. Although the draft described the term "connection" as a "unidirectional *mapping* between equivalent BS and SS peers," there is no evidence to suggest an actual connection between the BS and SS. (*See id.* at 2410.) Moreover, the "connection identifier" in the standard document and the '040 Patent both refer to addressing information used to *identify* user connections, not the *actual* connections themselves. (*See id.*) Because the '040 Patent Application is consistent with the specification of the '040 Patent and the Court's *Markman* Order, Wi-LAN's Motion must be denied.

## C. There Is Only One "Specified Connection" Between the Baseband Processor and the Base Station

### 1. The Asserted Claims of the '040 Patent Require a Plurality of "Specified Connections"

Wi-LAN disputes that the '040 Patent requires a plurality of "specified connections. But the asserted claims, which recite allocation of bandwidth based on *priority* of the "specified connection," require multiple connections to users and services. (*See* Scarsi Decl. ¶ 15, Ex. N at cols. 4:40–41 ("each node 16 *serving multiple connections for users*"), 19:37–38, 20:55–58, 21:18–26; ECF No. 98 at 3.) Separately, the invention of the '040 Patent "relates to a system and method of formatting data arriving in *SDUs of various formats* into different packets, having a *PDU packet format*, for transport across a communications link." (Scarsi Decl.

-15-

¶ 15, Ex. N at col. 2:3–6.)  The '040 Patent envisions different SDU formats received from a plurality of different users:

> For each system these packets may be of a standard length or ***may vary in length as the needs of the users dictate***, but the format of the packets are generally ***unique to the protocol utilized***.  Data packets utilizing a particular protocol and format may be referred to as service data units, or SDUs.

(*Id.* at col. 1:29–34 (emphasis added).)

Wi-LAN further points to the dependent claims of the '040 Patent and the use of "connection identifiers" to argue that SDUs from the ***same*** connection are packed into a single PDU.  (Mot. at 22–24.)  To the extent that this embodiment is illustrated in the '040 Patent, the '040 Patent's allocation and prioritization scheme still requires that the length of each PDU be determined as a result of the priority-based allocation of bandwidth to each of a plurality of connections.  (*See* Mot. at 22; Scarsi Decl. ¶ 15, Ex. N at cols. 19:37–40, 20:55–58, 21:18–26.)  As discussed above, the '040 Patent does not discuss priority between nodes, but rather priority between users with differing bandwidth needs.  Thus, the '040 Patent discloses a system that converts data from multiple user connections in multiple formats into one common transport format.  Accordingly, and as the Court held, there must be more than one "specified connection" in the claimed invention.  (ECF. No. 278.)

### 2. *Only One "Specified Connection" Exists Under Wi-LAN's New Theory*

Even under its new infringement theory, Wi-LAN still cannot show more than one connection from the baseband processor in the accused products to the base station. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

Moreover, as is required by the '040 Patent, the signaling radio bearer (SRB) cannot be a "specified connection" because it does not carry user data originating from a user or service.

Even if the SRB were a "specified connection" under Wi-LAN's theory, the accused products would still fail to meet the '040 Patent's other limitations. ███ Thus, Wi-LAN's infringement theory also fails as a matter of law because the accused products have at most one "specified connection" from which data is packed and fragmented.

## VI. SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE '640 PATENT WAS WARRANTED

As with the term "specified connection" in the '040 Patent, Wi-LAN now argues that the term "UL connections" in the '640 Patent refers to links between

the wireless subscriber radio unit and the ***base station***.  For the reasons discussed below, the intrinsic record, including the claims, specification, and prosecution history of the '640 Patent, supports the Court's construction, not Wi-LAN's newly proposed theory.  But even if the Court were to adopt Wi-LAN's improper construction of "UL connections," Wi-LAN would still be unable to show multiple connections, as required by the claims.

### A.    The Court's Construction of "UL Connections" Is Correct

As the Court recognized in its *Markman* Order, and as the specification makes clear, the '640 Patent is directed to improving a wireless communications system by introducing the concept of an intermediary "wireless subscriber radio unit," exemplified in the specification by the Customer Premises Equipment ("CPE").  Rather than a traditional local area network that allows direct communication between an end user and a base station, the '640 Patent describes CPEs that receive an allocation of bandwidth from the base station to distribute to users and services.  (*See* Scarsi Decl. ¶ 21, Ex. T at cols. 1:20–24, 23:7–34:45.)  Once the CPE is allocated bandwidth by the base station, it "advantageously determines which services to give bandwidth to and which services must wait for subsequent bandwidth requests."  (*Id.* at col. 10:41–56.)  By designing the CPE to independently distribute allocated bandwidth to its services and end users, the '640 Patent states that "the communication overhead that is required by having the base station instruct the CPE how to distribute its allocated bandwidth is thereby eliminated, thus increasing usable system bandwidth."  (*Id.* at col. 10:60–65.)

Accordingly, uplink data flows from the users and services, through the CPE to the base station, and ultimately to its final destination in the network.  Figures 7 and 8 of U.S. Patent No. 6,016,311 (the "'311 Patent"), incorporated in the '640 Patent by reference, illustrate this relationship.  (*See* Scarsi Decl. ¶ 22, Ex. U at figs.7–8.)  Figure 7, reproduced below, depicts the gateway of an exemplary residential CPE (142) serving multiple users on a plurality of connections (e.g.,

-18-

147, 149, 154), and transmitting to a base station via antenna (140):



Fig. 7

(*Id.* at fig.7, *see also id.* at cols. 11:26–13:3.)[10]  Recognizing this relationship between the "UL connections" and the users or services, the Court construed the term "UL connections" as "an uplink connection between the wireless subscriber radio unit and its users."  (ECF No. 98 at 8.)

Tellingly, Wi-LAN declines to seek reconsideration regarding claim 6, while insisting that the term "connections" also refers to links between the wireless subscriber radio unit and the base station.  (Mot. at 12–13.)  But claim 6, which requires the uplink queue at the CPE contain data "***received*** on a plurality of connections," indisputably demonstrates that the term "connections" refers to connections between users or services and the wireless subscriber radio unit.

**B.      Wi-LAN's Cited Evidence Supports the Court's Claim Construction**

Wi-LAN's Motion elects to focus on one aspect of the claimed invention while completely ignoring another.  Indeed, the '640 Patent describes the use of a two-step bandwidth request process between the intermediary and the base station.  (*See* Scarsi Decl. ¶ 21, Ex. T at cols. 1:20–24, 3:56–4:33.)  But Wi-LAN overlooks the second feature of the '640 Patent: the allocation of uplink bandwidth ***to end***

---

[10] Substantially identical figures are featured in U.S. Patent No. 6,925,068, to which the '640 Patent claims priority.  (*See* Scarsi Decl. ¶ 23, Ex. V.)

*users and services*. (*See id.* at col. 4:34–4:36 ("The CPE is responsible for *distributing the allocated uplink bandwidth in a manner that accommodates the services provided by the CPE*.") (emphasis added).) Thus, understood in the full context of the '640 Patent, Wi-LAN's new evidence is more consistent with the Court's *Markman* Order than with Wi-LAN's proposed constructions.

### 1. The '640 Patent Allocates Bandwidth Based on QoS Priority Across User Connections, Not Control Messages

The '640 Patent describes an uplink bandwidth allocation process at the CPE in which connections to users and services are prioritized based on quality of service demands that each carries:

> CPEs 110 request bandwidth allocations from their respective base stations 106 based upon the type and quality of *services requested by the customers served by the CPEs. Different broadband services have different bandwidth and latency requirements.* The type and quality of services available to the customers are variable and selectable. The amount of bandwidth dedicated to a given service is determined by the information rate and the quality of service required by that service (and also taking into account bandwidth availability and other system parameters).

(*Id.* at col. 2:16–33 (emphasis added); *see also id.* at cols. 7:9–12; 10:49–56 (describing high- and low-priority services).) As described above, "services" are associated with data-generating customers. In contrast, the '640 Patent describes "control messages" (e.g., bandwidth requests) as system-based information separate and distinct from data from services. (*Id.* at col. 16:6–9 ("After *CPE scheduled data*, *control messages*, and polling are allowed for, the base station allocates all unused time in the upstream part of the TDD frame to contention, either for bandwidth requests or for registration purposes.") (emphasis added).) The '640 Patent does not describe control information as having quality of service characteristics for prioritization purposes.

This distinction between user data and control messages is further illustrated by the '640 Patent's description of the "piggybacking" technique. When a wireless

-20-

subscriber radio unit receives an allocation of uplink bandwidth, it allocates this bandwidth to its end users and services "based on QoS priority." (*Id.* at col. 23:28–33.) In some instances, "the CPE *'steals'* bandwidth ***already allocated for a data connection*** by inserting bandwidth requests in time slots previously used for data." (*Id*. at col. 4:28–33.) If, as Wi-LAN suggests, "control messages" are treated the same as data generated by end users and services, the '640 Patent's prioritization scheme would naturally prioritize "control messages" over user data without the need to "steal" bandwidth. Thus, because "control messages" are distinguished from data received via user connections, "connections" carrying only control messages cannot be "UL connections" as the term appears in claim 1.

### 2.    *Wi-LAN Misidentifies "Connections" in the '640 Patent*

Because the specification of the '640 Patent does not recite the term "UL connections," Wi-LAN attempts to show multiple "connections" between the wireless subscriber radio unit and the base station by mischaracterizing references to "connections" in the '640 Patent.[11] First, Wi-LAN suggests that each "connection identifier"—assigned to a user or service, as well as to the wireless subscriber radio unit for control messages—represents a distinct connection. (*See* Mot. at 5–6.) However, the "connection identifier" of the '640 Patent is merely a 16-bit data field that helps to route the flow of data from point to point. By example, the '640 Patent describes three types of identifiers: (1) the "basic connection ID" used to exchange MAC control messages, (2) the "control connection ID" used to exchange higher level control information, and (3) a regular "connection ID" assigned to each service connected to the CPE. (*See* Scarsi Decl. ¶ 21, Ex. T at col. 14:39–57.) Using these "connection identifiers," a base station receiving an uplink transmission may thus identify the origin and

---

[11] Wi-LAN once again looks to the '359 Patent for support of its position. Apart from the fact that the '359 Patent is neither related to nor covers the same subject matter as the '640 Patent, the only recitation of the term "uplink connections" in the '359 Patent is qualified by specifying that connection's endpoints.

destination of each packet of data sent across the link from a wireless subscriber radio unit. (*See id.* at fig.7, col. 15:20–34.) The presence of connection identifiers in data packets confirms that there are multiple connections, each associated with an end user or service. But it does not lead one having ordinary skill in the art to conclude that there are multiple links to the *base station*.

Second, Wi-LAN mistakenly points to figure 10 of the '640 Patent as proof of multiple "UL connections" between the wireless subscriber radio unit and base station. But figure 10 "shows the ***message sequence*** that is used . . . in requesting polls using the 'poll-me' bit," not a physical illustration of "UL connections." (*Id.* at col. 5:38–39 (emphasis added).) In figure 10, the transmission of "data on connection n" and "data on connection k" is governed in part by one disclosed bandwidth request technique. Specifically, data arriving at the wireless subscriber radio unit on "connection k" waits until a bandwidth grant is received before being transmitted to the base station. Figure 10 provides no basis to conclude that there exist multiple links between the subscriber unit and the base station.

Finally, Wi-LAN points to claim 5 of the '640 Patent to contend that "UL connections established at the wireless subscriber radio unit" cannot connect to users and services. (*See* Mot. at 8.) The '640 Patent simply does not support this interpretation. As the Court found in its *Markman* Order and Summary Judgment Order, "UL connections" represent some relationship between two endpoints. That one endpoint must be the wireless subscriber radio unit, or that a connection can be "established" at one endpoint but not the other, is not conclusive evidence that the other endpoint must be the base station. Moreover, as discussed above, claim 6 of the '640 Patent much more clearly indicates that connections must be between users and the wireless subscriber radio unit.

### 3. *The Prosecution History for the '640 Patent Does Not Support Wi-LAN's Proposed Construction*

To support its construction, Wi-LAN once again refers to the Patent

Examiner's discussion of U.S. Patent No. 6,097,733 (the "Basu Patent") in the prosecution history for the '640 Patent. But this reference is inappropriate because the Patent Examiner never considered the Basu Patent in addressing the term "UL connections" as it now appears in claim 1. Thus, the Basu Patent is irrelevant to the construction of the term "UL connection" in the '640 Patent.

When Wi-LAN first filed its application for the '640 Patent (the "'640 Patent Application"), claim 1 did not include a step whereby the subscriber unit allocated bandwidth based on priority of "UL connections." (Scarsi Decl. ¶ 24, Ex. W at 2896.) In contrast, claim 18 did recite a limitation substantially similar to organization of data from "UL connections" onto queues, as claim 1 now requires.

> 18. A method of allocating UL bandwidth in a wireless subscriber unit in communications with an associated base station, the method comprising:
>
> **grouping at the subscriber station data received on a plurality of connections into one or more queues, based on the QoS of the data**;
>
> transmitting from the subscriber unit an explicit message to the base station requesting to be provided an allocation of uplink (UL) bandwidth in which to transmit a bandwidth request;
>
> receiving at the subscriber unit a bandwidth request opportunity comprising an amount of UL bandwidth; and
>
> transmitting the bandwidth request within the amount of UL bandwidth, the bandwidth request specifying a requested amount of UL bandwidth pertaining to a queue at the subscriber unit.

(*Id*. at 2898.) The inclusion of this limitation led the Patent Examiner to believe that the subscriber unit was an intermediary (i.e., a relay) and to seek clarification:

> Claim 18 puts forth "grouping at the subscriber station data received on a plurality of connection(s)" which is confusing, eg.[sic] where did the data come from? The examiner interprets that it is from perhaps other mobile devices (?) and hence the subscriber station is acting as a **relay**. If this is NOT the case, the application should amend the claim to be more explicit as to where this data is coming from.

(Scarsi Decl. ¶ 25, Ex. X at 2903.) Wi-LAN never provided clarification, and

instead cancelled claim 18. (Scarsi Decl. ¶ 26, Ex. Y at 2910.)

After amendment, the Patent Examiner cited the Basu Patent to reject claim 1 of the '640 Patent Application, relying solely on figure 7, which is an algorithm allocating bandwidth *within* the base station. (Scarsi Decl. ¶ 27, Ex. Z at 2916– 18.) Thus, when the Patent Examiner looked at the dependent claims regarding "UL connections," he was doing so from the base station's perspective of bandwidth allocation. In response, Wi-LAN disagreed with the Patent Examiner and noted that (1) the subscriber unit was an intermediary, and (2) the Basu Patent did not disclose allocation at the intermediary to each user connection:

> . . . Basu also does not teach or suggest "allocating, at the wireless subscriber radio unit, the UL bandwidth grant to one or more of a plurality of connections at the wireless subscriber radio unit." Basu describes the base station allocating bandwidth to voice or data for a subscriber. ***Basu does not appear to have any teaching of the subscriber station receiving a bandwidth allocation and then making the determination on how to allocate that bandwidth to its connections.*** Placing that function in the subscriber station can allow for more flexibility at the subscriber station and more intelligent allocation of the limited bandwidth.

(Scarsi Decl. ¶ 28, Ex. AA at 2931 (emphasis added).)

After Wi-LAN filed an appeal with the Board of Patent Appeals, the Patent Examiner withdrew his rejection on June 20, 2012. In explaining his decision, the Examiner stated that he "initially had difficulty understanding the applicant's inventive concept since the claims were highly confusing with regard to the basic operation of the system." (Scarsi Decl. ¶ 29, Ex. BB at 2935.) Several months later, Wi-LAN added the bandwidth allocation limitation to claim 1, effectively turning it into original claim 18. (Scarsi Decl. ¶ 30, Ex. CC at 2948.)

## C. There Is Only One "UL Connection" Between the Baseband Processor and the Base Station

Even under its flawed construction for the "connection" terms, Wi-LAN still cannot show more than one connection, no matter where that connection exists.

-24-

(*See* Mot. at 11.) ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████

██████████████████████████████████ Likewise, Wi-LAN annotates another

diagram from Dr. Madisetti's expert report showing data being transmitted via a

single physical channel. (*See* Mot. at 11 ("Uplink To Base Station").) Moreover,

Wi-LAN offers a figure from an LTE standard document titled "EPS Bearer

Service Architecture." (*See id.* at 12; ECF No. 286-16, Ex. A at 72, fig.13.1-1.)

That figure shows a logical mapping of radio bearers, not a physical illustration of

"connections" between the baseband processor and the network.[12] Thus, neither

Wi-LAN nor Dr. Madisetti has presented any evidence that the accused products

practice claim 1, as Wi-LAN now construes the term "UL connections."

## VII.  CONCLUSION

For the reasons stated above, Apple respectfully asks that the Court deny

Wi-LAN's Motion for Reconsideration of the Court's Order Granting Apple's

Motion for Summary Judgment of Noninfringement of the Patents-in-Suit.

---

[12] Figure 13.1-1 shows only EPS bearers, which do not include SRBs.  To the extent figure 13.1-1 shows ***any*** "connection" between the baseband processor and the base station, only one such "connection" transports data from users or services—the data radio bearer.  Thus, no plurality of "UL connections" is shown.

-25-

DATED: November 14, 2014     MILBANK, TWEED, HADLEY
                             & McCLOY LLP

                        By:   /s/ Mark C. Scarsi
                              Mark C. Scarsi (SBN 183926)
                              Milbank, Tweed, Hadley & McCloy LLP
                              601 South Figueroa, 30th Floor
                              Los Angeles, CA 90017
                              Telephone:  (213) 892-4000
                              Facsimile:  (213) 629-5063
                              Email:  mscarsi@milbank.com

                              *Attorney for Defendant Apple Inc.*

APPLE'S OPPOSITION TO WI-LAN'S MOTION FOR RECONSIDERATION
CASE NO. 3:13-CV-798-DMS (BLM)

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing document has been forwarded, via the Courts CM/ECF electronic filing system upon Plaintiff's counsel of record on November 14, 2014.


/s/ Mark C. Scarsi
Mark C. Scarsi

APPLE'S OPPOSITION TO WI-LAN'S MOTION FOR RECONSIDERATION
CASE NO. 3:13-CV-798-DMS (BLM)